**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DORN B. HOLLAND,
            *Plaintiff-Appellant,*

v.                                                      No. 06-1309

WASHINGTON HOMES, INCORPORATED,
            *Defendant-Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(8:04-cv-03581-DKC)

Argued: March 16, 2007

Decided: May 25, 2007

Before WILLIAMS, KING, and DUNCAN, Circuit Judges.

---

Affirmed by published opinion. Judge Williams wrote the opinion, in which Judge Duncan concurred. Judge King wrote a separate opinion concurring in part and dissenting in part.

---

**COUNSEL**

Edward Smith, Jr., SMITH & GARRET, P.A., Baltimore, Maryland, for Appellant. Steven R. Semler, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Washington, D.C., for Appellee.

---

**OPINION**

WILLIAMS, Circuit Judge:

Appellant Dorn B. Holland appeals the district court's award of summary judgment to Appellee Washington Homes, Inc. Holland claims that Washington Homes discriminated against him and wrongfully terminated his employment because of his race and his complaints of discrimination. Because Holland has failed to present a genuine issue as to any material fact, we affirm the district court's grant of summary judgment to Washington Homes.

I.

The following facts are presented in the light most favorable to Holland. *See, e.g.*, *Howard v. Winter*, 446 F.3d 559, 562 n.2 (4th Cir. 2006) ("When reviewing a district court's grant of summary judgment, we construe the facts in the light most favorable to the nonmoving party, which in this case was [the appellant].").

Holland is a black male who began working as a sales manager for Washington Homes on October 31, 1998. He sold homes in several subdivisions in the Maryland suburbs of Washington, D.C. for five years before he was terminated on October 30, 2003. Holland's compensation consisted of a base salary plus a commission of one percent for each home he sold. His gross salaries for his years of employment with Washington Homes were: 1998 - $4,614.88; 1999 - $65,444.46; 2000 - $74,197.04; 2001 - $58,818.80; 2002 - $40,430.73; 2003 - $131,520.77.

Holland's first assignment was to sell homes at Fairfield Commons, where he worked until the early months of 2001. Fairfield Commons is a predominately African-American community with a substantial crime rate. Holland was able to sell 89 of the 91 homes in Fairfield Commons and was named "rookie of the year" in 2000 due to his performance. At one point in March 2000, Holland met with his supervisor, Didi Peck, a white female vice president, to complain that a white male sales manager, Joseph Macco, was raiding his customers that were under contract. Holland claims that he was forced

to share his commissions with Macco, but Macco was not required to share his commissions with Holland. Holland further alleges that Macco was given other perks that Holland was not given during this time period.

In February 2001, Peck assigned Holland to the Winterset subdivision, where he worked until June 2001. Holland alleges that Peck transferred him to Winterset because of his race. He further claims that Washington Homes raised the sales prices of the homes in Winterset by $40,000 around the time of his transfer, thereby making it difficult for him to sell the homes. Finally, he alleges that during this time period, Carla Temple, a white female sales manager, was given certain benefits that were denied to him.

In July 2001, Holland was reassigned to the Arbor West subdivision, where he worked for a couple of months. Holland claims that his assignment to Arbor West was discriminatory because Cliff Martin, a white male sales manager, was allowed to continue selling homes at Arbor West for a week after Martin was reassigned elsewhere.

In September 2001, Peck assigned Holland to the Kingsview subdivision, which he felt was unfair because it required him to increase his transportation expenses. He also claimed that there were only nine homes to sell in Kingsview and that he was denied the opportunity to participate in a company promotion during this period.

In January 2002, Holland was reassigned to the Robinswood subdivision. He claims that this assignment also was discriminatory because Peck had tried to give the assignment to a white sales manager, but that sales manager turned it down. Nevertheless, he admitted that the assignment was "a big money maker and . . . fast money." (J.A. at 228.)[1] Holland says that during this period, Peck refused to sign him up for a National Association of Home Builders class. Moreover, on one occasion in March 2003, Hugo DeCesaris, the president of Washington Homes, asked Holland to make a pot of coffee. Holland claims that this request was discriminatory based on his race.

---

[1]Citations to the "J.A." refer to the joint appendix filed with this appeal.

In September 2003, Peck informed Holland that his next assignment would be Hamlin Park. When Holland told her that Hamlin Park was a blighted community and a bad assignment, Peck assured him that Hamlin Park was ready to be sold and that good money would be made there. When Holland viewed Hamlin Park, it was, in his opinion, not ready to be sold. Around the same time, Peck assigned Macco to the allegedly more desirable community of Winshire Estates.

On September 1, 2003, Holland went to see Edward Kaplan, Washington Homes' human resources vice president. Holland indicated that Peck might be discriminating against him. Kaplan told Holland to express his concerns to human resources manager Gretchen Leftrict. The human resources staff attempted to investigate the matter and resolve the conflict between Peck and Holland.

On September 16, 2003, Holland addressed his concerns over the Hamlin Park assignment to DeCesaris. Holland stated that DeCesaris told him that Holland would have success there because Holland knew "those people" and had "sold that kind of community before." (J.A. at 265.) Holland believed that even though he was enjoying his most successful year at Washington Homes, this new assignment was part of a company design to remove blacks from its workforce.

In late October 2003, Holland discussed his distaste of Peck with Maura Arndt, a new vice president. Thereafter, Arndt expressed concerns that Holland might physically hurt Peck. According to Arndt, Holland said, among other inflammatory things, that Peck "was a crazy bitch" and that he was "gonna show her!" (J.A. at 69.) Although Holland denies these allegations, Arndt claimed that she was so frightened of Holland and what he might do to Peck that she went to Leftrict and stated that she did not want Holland working for her because she was afraid of him. She also went to Peck and warned her to be careful. Upon reporting these allegations to management, Leftrict was instructed to immediately begin an investigation.

During the investigation, Arndt verified her story, and the allegations against Holland were corroborated by Peck's assistant, Brenda West. Leftrict also learned that Peck had previously sent Holland to

anger management class and that Holland had expressed his hatred for Peck to others.

On October 30, 2003, DeCesaris met with Peck and Leftrict to review Holland's complaints about his assignment to Hamlin Park. At this meeting, DeCesaris learned about Holland's physical threats toward Peck and determined that Washington Homes "cannot keep this guy around here if he is making these kinds of threats." (J.A. at 59-60.) After DeCesaris expressed his view that Holland must be terminated immediately, Leftrict explained that she was scheduled to meet with Holland later that day, and she would notify him of his termination at that time. Shortly thereafter, Holland met Leftrict in her office to get a copy of his personnel file. At that time, Leftrict told Holland that Peck had filed a formal charge against him and that he was being terminated immediately. Holland denied threatening Peck and claimed that his termination was retaliation.

Although Holland was fired on October 30, he was told that his end date would be changed to November 3, 2003, so that his 401K plan would reach five-year maturity. Washington Homes thereafter informed the Maryland Department of Labor, Licensing, and Regulation that Holland was dismissed because of lack of work. Thus, the company failed to inform the state agency that Holland was terminated for "gross misconduct." Washington Homes contends this "was done so as to not deprive appellant of unemployment compensation," just as his discharge date was changed to ensure that Holland's retirement benefits vested. (Appellant's Br. at 26.)

On May 4, 2004, Holland filed a charge of discrimination with the Prince George's County Human Relations Commission and the United States Equal Employment Opportunity Commission (EEOC). On August 26, 2004, the EEOC issued a right to sue letter. On November 8, 2004, Holland filed a complaint against Washington Homes in the District of Maryland pursuant to Title VII of the Civil Rights Act, 42 U.S.C.A. § 2000 *et seq.* (West 2003 & Supp. 2006). Holland alleged that he was fired due to his race and as retaliation for complaining of racial discrimination. He also claimed that during the course of his employment, he was denied employment opportunities because of his race.

On February 14, 2006, the district court entered summary judgment in favor of Washington Homes. The district court explained its judgment in a well-reasoned, thirty-three page memorandum opinion. *See Holland v. Washington Homes, Inc.*, No. 8:04-cv-03581-DKC (D. Md. Feb. 14, 2006). First, the district court determined that Holland could not show that he was terminated based on his race because Holland presented no evidence that DeCesaris did not believe that Holland had threatened Peck. Because Holland presented no evidence that could show that DeCesaris's legitimate proffered reason for firing Holland was disingenuous, the district court concluded that no issue of fact existed with respect to pretext. The district court also rejected his retaliation claim, finding once again that Holland could not show pretext. Finally, the district court rejected Holland's denial-of-opportunity claims because he could not show an adverse employment action with respect to his transfer to Hamlin Park, and all other claimed incidents were barred as untimely. Accordingly, the district court granted summary judgment to Washington Homes.

Holland timely appealed. We have jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006).

II.

We review de novo the district court's grant of summary judgment in favor of Washington Homes, applying the same standard as did the district court. *See Laber v. Harvey*, 438 F.3d 404, 415 (4th Cir. 2006) (en banc). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). We must construe the facts in the light most favorable to Holland, and we may not make credibility determinations or weigh the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Edell & Assoc., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 435 (4th Cir. 2001). But there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

Title VII makes it "an unlawful employment practice for an employer . . . to discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C.A. § 2000e-2(a)(1). Holland argues that he was fired because of his race and because he complained of racial discrimination. He further contends that Washington Homes denied him certain workplace opportunities because of his race. We will address each argument in turn.

A.

A plaintiff generally may defeat summary judgment and establish a claim for race discrimination through one of two avenues of proof. First, a plaintiff may establish a claim of race discrimination by demonstrating through direct or circumstantial evidence that his race was a motivating factor in the employer's adverse employment action. *See, e.g.*, *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc). "The second method of averting summary judgment is to proceed under a 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Id.* at 285.

On appeal, Holland confines his argument to the pretext framework. Under the *McDonnell Douglas* pretext framework, an employee demonstrates a prima facie case of race discrimination by showing that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Both parties agree that Holland has made out a prima facie case of discrimination. He is (1) a member of a protected class; (2) he was fired; (3) his job evaluations were satisfactory; and (4) his position was filled by a similarly qualified white candidate.

Because Holland presented a prima facie case, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill*, 354 F.3d at 285. This burden, however, is a burden of production, not persuasion. Here, Washington Homes met its burden by producing affidavits and testimony demonstrating that Holland was fired because DeCesaris believed that Holland made threats toward Peck. As a result of Washington Homes meeting its burden of production, "the *McDonnell Douglas* framework — with its presumptions and burdens — disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks and citations omitted). "In other words, the burden shifts back to [Holland] to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Hill*, 354 F.3d at 285 (quoting *Reeves*, 530 U.S. at 143).

Accordingly, the burden to demonstrate pretext has "merg[ed] with the ultimate burden of persuading the court that [Holland] has been the victim of intentional discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). In *Reeves*, the Supreme Court clarified how a claimant can avoid summary judgment under the *McDonnell Douglas* framework. Once the question comes down to pretext, a plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143 (internal quotation marks omitted). A plaintiff could accomplish this goal "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

In *Reeves*, the company claimed that Reeves was fired because he had failed at his responsibility of recording worker attendance. Reeves, however, offered evidence that he properly maintained the attendance records. This evidence, the Supreme Court explained, combined with the strong evidence supporting Reeves's prima facie case, was enough to support a jury's verdict of liability. *Reeves*, 530 U.S. at 146. Thus, the Supreme Court held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to con-

clude that the employer unlawfully discriminated." *Id.* at 148 (emphasis added). But the Supreme Court cautioned that this will not always be the case; for example, judgment as a matter of law may be appropriate if a "plaintiff created only a weak issue of fact as to whether the employer's reasons were untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* Thus, a key factor for courts to consider is "the probative value of the proof that the employer's explanation is false." *Id.* at 149.

Unfortunately for Holland, he has not put forth sufficient evidence showing that Washington Homes' proffered legitimate explanation was false. Aside from his denials as to the threats (which we accept as true), nothing in the record supports an inference that DeCesaris's explanation was pretextual, or perhaps more on point, that DeCesaris did not believe that Holland had threatened Peck when he made the decision to fire him.[2]

Holland makes a number of arguments against this conclusion, but they are unavailing. First, Holland contends that he was fired at 9:30 a.m. on October 30, 2004, which is flatly inconsistent with Washington Homes' statements that the decision to fire Holland was made during a meeting on the morning of October 30, and Holland was not informed of the decision until that afternoon. Holland contends that Washington Homes "fudged" affidavits to conceal the fact that the rationale to fire Holland was contrived after the real decision was made.

This is a serious charge that, if true, would go far beyond showing pretext on Washington Homes' part. The trouble for Holland, however, is that there is *no evidence* in the record that supports the contention that his meeting with Leftrict occurred at 9:30 a.m. or was scheduled at 9:30 a.m. There exists not even a scintilla of evidence that Holland's meeting with Leftrict occurred before the termination decision was made by DeCesaris. After being pressed at oral argu-

---

[2]For example, Holland claims that DeCasaris could not have believed that Holland threatened Peck "for countless reasons of common sense." (Reply Br. at 1.) Such bald assertions are unhelpful and do nothing to present a triable issue of fact.

ment about the lack of evidence, Holland eventually conceded as much and abandoned the claim.[3] Accordingly, Holland's first contention is without merit.

Holland further alleges, and our good colleague in dissent agrees, that an inference of pretext can be made because Washington Homes changed the date of his termination to November 3 and reported to a Maryland state agency that Holland was laid off, as opposed to terminated for cause. But Washington Homes claims it took these two steps to be charitable to Holland. By pushing his termination date a few days forward, Washington Homes allowed Holland's retirement benefits to vest. Second, by reporting that Holland was laid off, Washington Homes allowed Holland to seek unemployment benefits from Maryland. Regardless of whether this was "stupid" and "criminal" under Maryland law (Reply Br. at 1), it does nothing to discredit DeCesaris's statement that he fired Holland because he (the decision-maker) believed that Holland had threatened his supervisor. Moreover, nothing in the dissent even addresses how this could create an issue of fact over DeCesaris's belief.

"Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a 'genuine' dispute, the latter would fail to be 'material.'" *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006) (internal citation omitted).

Washington Homes has put forth evidence that its decisionmaker

---

[3]Prior to oral argument, Washington Homes filed a Local Rule 28(j) letter alerting the Court to the Fifth Circuit's recent decision in *Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255 (5th Cir. 2007), where the court affirmed the district court's imposition of sanctions against plaintiff's counsel for misquoting the record. *Id.* at 266. That case, however, is irrelevant as no sanctions were imposed by the district court in this case. Washington Homes also attempts to call our attention to Local Rule 46(g)(1), which addresses this court's power to discipline attorney misconduct. We are aware of our sanctioning powers and choose not to invoke them in this instance.

decided to fire Holland because he believed that Holland threatened his supervisor.[4] That Washington Homes, as part of its employment reporting responsibilities, thereafter reported a different reason and date of termination to a state employment agency does not cast doubt on the decisionmaker's proffered reason or create a genuine and material issue of fact. Rather, it shows later charity on the company's part,[5] and there is nothing in the record to suggest otherwise. In fact, Holland has put forth no evidence that contradicts Washington Homes' assertion that it inaccurately reported his termination date and reason solely to benefit Holland. Moreover, Holland does not argue that the inaccurate reporting somehow benefitted Washington Homes, or that the company had some hidden motive.

It is difficult, then, to take seriously the dissent's point on this matter. Where is the unresolved "conflict of material fact?" *Post* at 21. The only reason we have adopted "Washington Homes' explanation on why it falsely advised the Maryland Agency with respect to Holland's termination," *post* at 21, is because Holland has offered no contrary explanation. It takes two sides to create a conflict. Again,

---

[4]This case does not present the question of whether an employer may be liable under Title VII when an employee is dismissed as the result of the discriminatory actions of a coworker who was not the ultimate decisionmaker, but nevertheless exercised some substantial level of influence over the ultimate decisionmaker. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) (en banc) (declining to hold that "a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision become[s] a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision"). Rather, Holland argues that the actual decisionmaker (and the company as a whole) had a discriminatory motive.

[5]If the company had followed Holland's and the dissent's proposed route, Holland would have not only lost a job, but his 401K plan would have failed to reach maturity by a few days, and he would have been denied state unemployment benefits. Of course, the message to employers is clear: Do no favors for those you terminate for cause, for the risk is a Title VII discrimination suit and a dissent in the Federal Reporters labeling you "an admitted liar." Post at 23. The old adage, no good deed goes unpunished, has never rung so true.

Holland has put forth no evidence that any other reason besides charity contributed to the report. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" (quoting Fed. R. Civ. P. 56(e))). Thus, although a reasonable trier of fact would conclude that Washington Homes reported a different reason and date,[6] when combined with the company's innocuous reasoning for these decisions and Holland's failure to present any other evidence — beyond baseless speculation — that DeCesaris's stated reason was pretextual, that trier of fact "would be hard-pressed to conclude that this established pretext." *Price v. Thompson*, 380 F.3d 209, 216 (4th Cir. 2005) (affirming district court's award of summary judgment to company in Title VII case where evidence of pretext was equivocal at best).

This conclusion fits nicely within our precedent.[7] In *Tinsley v. First*

---

[6]It is important to note that these clerical decisions were not made by DeCesaris, the decisionmaker who decided to fire Holland.

Oddly, the dissent seems unconcerned with the change in Holland's termination date. Perhaps the dissent agrees that action could only have been charitable. Why it presents a different situation than the report to the state agency, however, is anyone's guess.

[7]The precedents cited by our good dissenting colleague, however, are inapposite. In *E.E.O.C. v. Sears Roebuck & Co.*, for example, Sears continually changed its story during the course of discovery. 243 F.3d 846, 849-50 (4th Cir. 2001). Likewise, in *Alvarado v. Board of Trustees*, Alvarado "was told he was terminated because there was a lack of work at the College." 928 F.2d 118, 122 (4th Cir. 1991). The College thereafter claimed that Alvarado was fired for "unsatisfactory job performance." *Id.* at 123. *Sears* and *Alvarado* stand for the proposition that when a company changes its story after it cannot support its initial story, there is an obvious issue of pretext. Here, on the other hand, Washington Homes never changed its story. It did not give Holland one justification and the courts another. Washington Homes' explanation has been consistent from the moment it informed Holland he was being terminated — he was being fired because he threatened to kill his supervisor, the same explanation Washington Homes gave the courts. Nevertheless, to show charity to Holland in an aspect completely unrelated to the course of this litigation, the company told a state agency he was laid off. According to our precedents, this is not the stuff of which pretext is made.

*Union Nat'l Bank*, for example, we affirmed the district court's grant of summary judgment to the Bank in a Title VII case because the plaintiff "offer[ed] no evidence that the events recounted in [the decisionmaker's] affidavit are untrue or that retaliation was the true reason for [the] firing." 155 F.3d 435, 444 (4th Cir. 1998). We explained that the "uncontested evidence establishe[d] that [the decisionmaker] honestly believed that Tinsley deserved to be discharged." *Id.*

Here, the uncontested evidence established that DeCesaris (the decisionmaker) honestly believed that Holland deserved to be discharged for threatening Peck, regardless of whether Holland did in fact issue the threats. Thus, Holland's evidence failed to address whether DeCesaris did not honestly believe that the threats were made, and ultimately, "[i]t is the perception of the decisionmaker which is relevant." *Id.*; *see, e.g.*, *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 246 (1st Cir. 2006) ("In assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." (internal quotation marks omitted)).

Accordingly, we agree with the district court's treatment of the issue:

> Even if [Holland] did not threaten Ms. Peck, which the court must accept for purposes of this motion, Plaintiff has come forward with no evidence to show that Mr. DeCesaris did not believe [Holland] had made threats when Mr. Decesaris decided to fire [him].

(J.A. at 419.) In short, on the evidence in the record, no reasonable juror could conclude that Washington Homes' "proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Beyond that, Holland has failed to put forth sufficient evidence showing that discrimination was the real reason behind Washington Homes' decision. Accordingly, we affirm the district court's judgment with respect to Holland's discriminatory discharge claim.

## B.

Holland further contends that he was fired for complaining about race discrimination. To state a prima facie case of retaliation, Holland

must show (1) that he engaged in a protected activity; (2) Washington Homes acted adversely against him; and (3) the protected activity was causally connected to the adverse action. *See, e.g.*, *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997).

It is undisputed that Holland engaged in a protected activity by complaining about disparate treatment and that Washington Homes acted adversely against him by terminating his employment. The parties, however, dispute whether the third element is satisfied.

To prove a causal connection, Holland must be able to show that Washington Homes fired him "*because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). The first thing Holland must be able to prove, therefore, is DeCesaris's knowledge that he engaged in a protected activity. Although the evidence is unclear on this point, we assume that DeCesaris knew of Holland's previous complaints and that Holland has made out a prima facie case.

Because we assume a prima facie case exists, the burden shifts to Washington Homes "to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." *Beall*, 130 F.3d at 619. Washington Homes has offered DeCesaris's belief in Holland's threats as the real reason for the discharge. Accordingly, the burden shifts back to Holland to show that the reason is "mere pretext for retaliation by proving both that the reason was false, and that discrimination was the real reason for the challenged conduct." *Id.* (internal quotation marks omitted).

Holland cannot show that the decision was mere pretext for the same reasons that he could not make that showing with respect to his discriminatory discharge claim. He presented no evidence that DeCesaris fired him to retaliate as opposed to DeCesaris's belief that Holland threatened Peck. In this context, it is once again "the perception of the decisionmaker which is relevant not the self-assessment of the plaintiff." *Id.* (internal quotation marks omitted). Accordingly, we affirm the district court's grant of summary judgment to Washington Homes on Holland's retaliatory discharge claim.

## C.

Holland's remaining claims are best described as claims that he was treated disparately because of his race. Most significantly, he contends that white sales managers similarly situated to him received better opportunities with respect to commissions, advancement, incentives, and training. Washington Homes contends that the majority of Holland's claims are time barred and that his remaining claim fails to state a Title VII violation. We agree.

Title VII establishes two potential limitations periods within which a discrimination charge may be filed with the EEOC. *See* 42 U.S.C.A. § 2000e-5(e)(1). "The basic limitations period is 180 days after the alleged unlawful employment practice. However, the limitations period is extended to 300 days when state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency." *Tinsley*, 155 F.3d at 439. Holland qualifies for the 300 days' limit.

Holland contends that he was discriminated against when Washington Homes assigned him to Hamlin Park. That reassignment occurred within the 300 days' period.

To prevail on a Title VII claim, "the existence of some adverse employment action is required." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An adverse employment action is a discriminatory act that "adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *Id.* (internal quotation marks omitted). "The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action." *Id.* at 376. There must be some significant detrimental effect and "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999).

Holland claims that selling homes in Hamlin Park would have been more difficult because the area was blighted, and thus, presumably,

his compensation would have decreased. Beyond Holland's bald assertion, however, he has put forth no evidence demonstrating that his compensation would have been adversely affected by the reassignment. He did not identify where the neighborhood is located, the type of home being sold, the crime rate, or information about the home values in the surrounding area. In short, he has provided no evidence to support his assertion that he would have been adversely affected by the move. "[S]peculation about the future adverse consequences of a reassignment may not rise to the level of a genuine dispute [because] we are left to guesswork and conjecture as to what [Holland's] prospects would have been." *James*, 368 F.3d at 377. Accordingly, Holland cannot show that he suffered an adverse effect because of his reassignment to Hamlin Park.

Holland further contends that even if the Hamlin Park assignment was not discriminatory in violation of Title VII, Washington Homes committed other discrete discriminatory acts. Although he concedes that these other acts occurred outside of the 300 days' parameter, Holland argues we should nevertheless consider them under the "continuing violation" theory.

The continuing violation theory allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination, i.e., when the incidents make up part of a hostile work environment claim. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002) ("Given . . . that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.").

Holland, however, cannot benefit from the continuing violations theory because he has alleged discrete violations. Although Holland claims that he was denied benefits by Washington Homes that were given to whites because of "his race and the application of [the company's] institutionalized policy," we, along with other courts, "have declined to extend the limitations periods for discrete acts of discrimination merely because the plaintiff asserts that such discrete acts occurred as part of a policy of discrimination." *Williams v. Giant*

*Food, Inc.*, 370 F.3d 423, 429 (4th Cir. 2004); *see also Cherosky v. Henderson*, 330 F.3d 1243, 1248 (9th Cir. 2003) ("[I]f the mere existence of a policy is sufficient to constitute a continuing violation, it is difficult to conceive of a circumstance in which a plaintiff's claim of an unlawful employment policy could be untimely." (internal quotation marks omitted and citation omitted)).

Holland "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period." *Morgan*, 536 U.S. at 114. Simply put, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. Aside from the Hamlin Park assignment and Holland's termination, all other alleged acts occurred outside the 300 days' period. That Holland claims that these time-barred acts against him were related to Washington Homes' overarching policy of discrimination is of no consequence. We therefore hold that because the Hamlin Park reassignment does not constitute a violation of Title VII, and that is his only claim within the 300 days' time period, summary judgment was proper on Holland's remaining claims.

### III.

Washington Homes has put forth uncontested evidence that it terminated Holland because its decisionmaker believed that Holland was making physical threats toward his supervisor. Whether Holland actually made these threats is irrelevant in this context because it is uncontested that the decisionmaker believed that he did. Title VII endeavors to eliminate workplace discrimination, but the statute was not designed to strip employers of discretion when making legitimate, necessary personnel decisions, such as the decision to terminate an employee when an investigation determines that employee made physical threats against a supervisor. Because Holland failed to put forth sufficient evidence that the decisionmaker had some other illegitimate motive in firing him, we must affirm the district court's award of summary judgment to Washington Homes.

*AFFIRMED*

KING, Circuit Judge, concurring in part and dissenting in part:

This appeal is controlled by a simple principle: Where the defendant employer in a race-based termination and retaliation action has

tendered multiple, contradictory explanations for its termination of the plaintiff — and has admitted that one of those explanations was a lie — a jury must decide whether the employer's court-proffered explanation for the termination is pretextual. That straightforward precept is compelled both by our precedent and by fundamental principles of evidence, and should be entirely uncontroversial. Yet the majority rejects it, instead holding that such a mendacious defendant can be found credible *as a matter of law*.

Accordingly, although I concur in the portion of the majority's opinion ruling that Dorn Holland's claims of pre-termination disparate treatment are time barred (Part II.C), I respectfully dissent from the majority's affirmance of summary judgment on Holland's race-based termination and retaliation claims (Part II.A and .B). To the contrary, Holland has presented sufficient evidence to demonstrate that Washington Homes' asserted nondiscriminatory reason for terminating Holland was pretextual. More specifically, Holland has presented compelling evidence of a material factual dispute, in that Washington Homes provided the Maryland Department of Labor, Licensing, and Regulation (the "Maryland Agency") with an entirely different basis for Holland's termination than that it has espoused in this case. As explained below, Washington Homes' false statement in this regard warrants a trial on Holland's race-based termination and retaliation claims.

As spelled out in the majority's opinion, Holland has pursued his discriminatory termination and retaliation claims against Washington Homes under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this standard, once a plaintiff has established a prima facie case of unlawful discrimination or retaliation, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc). Here, as properly recognized by the majority, Holland has established prima facie race-based termination and retaliation claims, and Washington Homes has responded with its asserted nondiscriminatory reason for the termination. Specifically, Washington Homes contends in this proceeding that Holland was terminated because its President believed Holland had made threatening statements against his supervisor. Because Washington Homes articulated

a nondiscriminatory reason for firing Holland, "the burden shifts back to [Holland] to prove by a preponderance of the evidence that [Washington Homes'] stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Hill*, 354 F.3d at 285 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). Holland is entitled to establish such a pretext "by showing that the employer's proffered explanation is unworthy of credence." *Reeves*, 530 U.S. at 143 (internal quotation marks omitted). My disagreement with the majority centers on the evidence of pretext.

On appeal, Holland contends that the evidence creates a genuine issue of material fact on whether Washington Homes' proffered explanation for his termination was false. Holland has forecast evidence that, even though Washington Homes informed him that he was being terminated for misconduct, it thereafter reported an entirely different reason for his discharge to the Maryland Agency (which contacted Washington Homes when Holland applied for unemployment benefits), asserting that Holland had in fact been terminated for lack of work.

The majority acknowledges that Washington Homes reported a conflicting reason for Holland's termination to the Maryland Agency, but concludes that this evidence does not discredit Washington Homes' contention that it terminated Holland for threatening his supervisor. The majority sees this conflict as simply a minor discrepancy, concluding that Holland has failed to demonstrate that Washington Homes' court-proffered explanation is pretextual. In so ruling, the majority relies on *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006), which recognized that a "plaintiff cannot seek to expose [an employer's] rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity." In *Hux*, a decision in which I joined, the plaintiff had sought to rebut the employer's proffered reason of inferior job qualifications by comparing "herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination." 451 F.3d at 315.

The *Hux* case, however, is materially different from the situation here. Holland is not seeking to demonstrate pretext by focusing on a single factor severed from a combination of other factors. Instead, he

shows pretext by focusing on the fact that Washington Homes has provided two contradictory explanations for his termination, a proposition supported by our precedent in *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001), and *Alvarado v. Board of Trustees*, 928 F.2d 118 (4th Cir. 1991).

In the *Sears* case, the plaintiff had presented evidence that Sears had, over the course of the litigation, provided a variety of legitimate, nondiscriminatory explanations for its failure to hire him. 234 F.3d at 852-53. In evaluating whether this evidence was sufficient to demonstrate pretext, we concluded that it was, and the fact that Sears offered multiple, inconsistent justifications for its adverse employment action was, "in and of itself, probative of pretext." *Id.* at 853. In *Alvarado*, we ruled that the plaintiff had presented sufficient evidence of pretext by showing that his employer first asserted he was being fired for lack of work, and then later alleged that he was fired for unsatisfactory job performance. 928 F.2d at 122-23; *see also Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002) ("The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext . . . ."); *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) ("[W]hen a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual."); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext."); *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (concluding that reasonable juror could infer that employer's inconsistent explanations were evidence of pretext). Based on the relevant precedent, Holland has presented sufficient evidence of pretext in this case, showing that Washington Homes has, at different times, given contradictory reasons for his termination.

In order to counter Holland's evidence that Washington Homes has made two conflicting — and irreconcilable — explanations for his termination, the majority concludes that its reporting of a different termination reason to the Maryland Agency fails, as a matter of law,

to cast doubt on its position in this case. In so doing, the majority relies on Washington Homes' explanation that, in making its false statement to the Maryland Agency, it was simply acting out of charity. The majority is incorrect in this regard, however, because it is thereby impermissibly resolving a conflict of material fact. In adopting Washington Homes' explanation on why it falsely advised the Maryland Agency with respect to Holland's termination, the majority is making a credibility determination that is inappropriate in our assessment of a summary judgment award. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."). Put simply, it is for a jury, not an appellate court, to decide whether Washington Homes was being charitable or, instead, that its conflicting positions constitute evidence of discriminatory misconduct. *See id.*[1]

The majority apparently fails to recognize that there were, under this evidence, three different stories presented concerning Holland's termination. First, Holland contends that he was terminated because of his race and his previous complaints of discrimination. Washington Homes, by contrast, maintains in this proceeding that Holland was terminated because he threatened his supervisor. The third story is the one Washington Homes asserted to the Maryland Agency: that Holland was terminated for lack of work. Because Washington Homes admittedly lied to the Maryland Agency, a jury, under settled evidentiary principles, including the maxim of *falsus in uno, falsus in omnibus* ("false in one thing, false in all"), would be entitled to disregard all of its evidence concerning Holland's termination. *See Black's Law Dictionary* 491 (7th ed. 1999) (describing maxim as "[t]he principle that if the jury believes that a witness's testimony on a material issue

---

[1]It is immaterial that Washington Homes, in connection with its admitted false statement to the Maryland Agency, changed Holland's termination date so that his 401(k) plan would mature. That circumstance does not at all explain Washington Homes' admission that it lied at least once concerning its reason for terminating Holland. In fact, the relevant issue is not why Washington Homes lied, but whether Holland has established pretext by demonstrating that Washington Homes gave two entirely inconsistent explanations for Holland's termination. *See Sears*, 243 F.3d at 853; *Alvarado*, 928 F.2d at 122-23.

is intentionally deceitful, the jury may disregard all of that witness's testimony"); *see also* Kevin F. O'Malley et al., *Federal Jury Practice and Instructions* § 15.06 (5th ed. 2000) (spelling out time-honored jury instruction that "[i]f a person is shown to have knowingly testified falsely concerning any important or material matter, you obviously have a right to distrust the testimony of such an individual concerning other matters"); Edward J. Devitt et al., *Federal Jury Practice and Instructions* § 73.04 (4th ed. 1987) (spelling out similar jury instruction that "[i]f a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness's testimony in other particulars and you may reject all the testimony of that witness or give it such credibility as you may think it deserves").[2]

Finally, the majority has failed to view the evidence in the proper light, that is, in the light most favorable to Holland, as the non-moving party. *See Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004) (recognizing that courts must view "the facts and inferences drawn therefrom in the light most favorable to the non-moving party" in reviewing summary judgment award). Instead, the majority has viewed the conflicting evidence in the light most favorable to the defendant, concluding that Washington Homes was being charitable to Holland in providing false information to the Maryland Agency and that it is being truthful now.[3] On the contrary, we should — for summary judgment purposes — conclude that Washington Homes terminated Holland because of race and his previous complaints of discrimination, and that it is not being truthful when it asserts that Holland was terminated for threatening his super-

---

[2]Holland has no obligation — under the *McDonnell Douglas* burden shifting standard — to further counter Washington Homes' evidence that it lied only to the Maryland Agency (proof that Washington Homes gave two inconsistent explanations is sufficient).

[3]Under Maryland law, Washington Homes could, on the basis of its present position, be subject to prosecution for a misdemeanor, because "an employer, its officer or agent, or another person" may not "knowingly make a false statement or fact representation or knowingly fail to disclose a material fact" to "avoid becoming or remaining subject" to Maryland's labor and employment laws. Md. Code Ann., Lab. & Empl. § 8-1302 (West 2007).

visor. Put simply, we should not — on summary judgment review — credit the position of an admitted liar.

I would reverse the award of summary judgment to Washington Homes on Holland's race-based termination and retaliation claims. I therefore respectfully dissent.