**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-1313**

ANTHONY D. HARRIS,

                    Plaintiff - Appellant,

          v.

THE HOME SALES COMPANY,

                    Defendant - Appellee,

          and

THE MARYLAND HOME SALES COMPANY, INCORPORATED; APARTMENT
SERVICES, INCORPORATED,

                    Defendants.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  Richard D. Bennett, District Judge.
(1:09-cv-01109-RDB)

Argued:  September 20, 2012         Decided:  December 14, 2012

Before WILKINSON, DIAZ, and FLOYD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** George Alphanso Rose, ROSE LAW FIRM LLC, Baltimore,
Maryland, for Appellant.  Kelly Culp Lovett, KOLLMAN & SAUCIER,
PA, Timonium, Maryland, for Appellee.  **ON BRIEF:** Peter S.
Saucier, KOLLMAN & SAUCIER, PA, Timonium, Maryland, for
Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellant Anthony Harris appeals the district court's award of summary judgment to Appellee Apartment Services, Inc. and its corporate affiliates. Harris claims that Apartment Services discriminated against him, wrongfully demoted him, and wrongfully terminated his employment because of his race and in retaliation for his complaints of discrimination. For the reasons that follow, we affirm the district court's grant of summary judgment to Apartment Services.

I.

A.

The following facts are presented in the light most favorable to Harris. See Howard v. Winter, 446 F.3d 559, 562 (4th Cir. 2006). Apartment Services, a property management company, owns and manages more than forty apartment and townhome communities in Maryland and Pennsylvania. Each property has an on-site leasing and service staff headed by a full-time supervisor. Apartment Services employed Harris, an African American, from 1997 until his termination in May 2005. Harris initially served as a maintenance technician for the company at a number of properties. In 2000, he was promoted to maintenance supervisor of the Rosalind Gardens property in Baltimore, Maryland. During this time, Harris lived rent-free in a

3

townhome supplied by Apartment Services on one of its properties, McDonogh Village, which was a short drive away from Rosalind. Harris remained at this job until April 2005 and performed satisfactorily as Rosalind's maintenance supervisor. In reviews, however, his supervisor noted that Harris had issues with punctuality and accessibility during work hours.

At some point in March 2005, Harris's supervisor, Jeff Steinhoff, informed Rosalind employees that a new property management company, CT Management, would take over operation of the property as of May 1, 2005. In return, Apartment Services would assume management of Somerset Woods, one of CT Management's properties in Severn, Maryland. Steinhoff then offered the employees the opportunity to stay with Apartment Services at a different property, not necessarily Somerset, at the same pay and benefits, or to remain at Rosalind as a CT Management employee. All of the employees, including Harris, chose to remain an Apartment Services employee at one of the other properties.

Because Apartment Services planned to take over responsibility for Somerset Woods on May 1, 2005, it needed to fill the maintenance supervisor position and technician positions for the property by that date. Steinhoff spoke with Todd Hamlett, who was scheduled to become Somerset's manager, and Ray Wilkens, Apartment Services's Vice President of

4

Operations, regarding new positions for the Rosalind employees. Based on Steinhoff's recommendation, Hamlett agreed to offer Harris the position of maintenance supervisor at Somerset. Accordingly, either in March or early April, Steinhoff, on Hamlett's behalf, offered the position to Harris. At that time, Harris indicated he was interested in the position, but he expressed concerns, particularly about the increase in his commute time, and sought additional pay and benefits. Indeed, in mid-April Harris contacted Trudy Via, Director of Human Resources for Apartment Services, seeking to discuss additional pay and benefits. Harris nevertheless asserts he accepted the offer without reservation.

At some point several weeks thereafter, Hamlett offered the position to Mike King, a Caucasian supervisor in training. Although King had worked for the company two years longer than Harris, he had not previously held a supervisory position. King promptly accepted the position. The record shows that Hamlett (1) waited several weeks after Steinhoff offered the position to Harris before offering it to King and (2) was unaware of Harris's willingness to work at Somerset when he offered the position to King.

After work on Friday, April 29, 2005, Steinhoff instructed Harris to report for work at Somerset on Monday, May 2, 2005. Harris appeared for work at Somerset on May 2, 2005, five

minutes past his scheduled start time of 8:00 AM. Harris's medical records show that, before coming in to work on this date, Harris went to a medical center for a pre-employment drug test for Maryland Management Corporation, another property management company.

After Harris arrived at the property, he greeted Mike King in the leasing office and claims he overheard Hamlett on the phone say to King, "Tell that nigger to get to work on time." Harris asserts that King then said, "Todd says to get to work on time." Both Hamlett and King deny making and hearing the offensive remark, respectively. Deborah Baldauf, the property leasing manager, was also present in the office and denies hearing Hamlett's derogatory remark.

Upon his arrival, Harris found out he had been assigned to the position of a maintenance technician, although he was given the same pay and benefits as his previous position. Harris also discovered that the supervisory maintenance position had been filled by a white employee. Upon learning this information, Harris claims he became distraught. He reports that he asked to speak to Hamlett about his concerns, but that Hamlett failed to contact him. After working for three days at Somerset and becoming increasingly anxious about the work situation and racial epithet, Harris left early on May 5, 2005, to visit a doctor about his anxiety. Harris faxed a letter to Apartment

Services explaining his sick leave for three business days. Harris's doctor released him to return to work on May 10, 2005.

While on sick leave, Harris continued to take steps to secure employment with Maryland Management. On May 9, 2005, he completed employment paperwork at the company's office. His offer letter, dated May 9, 2005, indicated a start date of May 16, 2005. At his deposition, Harris claimed he felt he had to seek alternative employment while on sick leave because he feared for his job after his demotion.

Although his doctor released him to work on May 10, 2005, Harris failed to report for work thereafter because he claims he felt "emotionally sick" about his employment situation and had not yet spoken with Hamlett. According to Harris, on May 11, 2005, he had a lawyer call Apartment Services concerning his employment status. In response, Hamlett contacted Harris by phone. However, Hamlett states that he spoke with Harris, without prompt, by phone on May 10, 2005, or May 11, 2005, when Harris failed to appear for work.

Harris and Hamlett provide conflicting descriptions of their phone conversation. Harris concedes that Hamlett offered to install Harris as a maintenance supervisor at another property, Lawyers Hill. Harris also reports that he complained at that time about Hamlett's use of a racial epithet. Harris contends that Hamlett told him to take the rest of week off on

personal leave, and that Hamlett would contact him later in the week about the Lawyers Hill position. When deposed, Hamlett agreed that he offered Harris the position at Lawyers Hill but noted that Harris did not accept the offer. Hamlett claims that Harris stated he would get back to Hamlett with a final decision on the opportunity. Hamlett denies instructing Harris to remain at home for the remainder of the week.

On May 12, 2005, Harris faxed completed sign-in sheets to Apartment Services showing the he was taking personal leave for the remainder of the week. On the cover sheet, he asked to speak with Trudy Via "about [his] employment and unfair job treatment by a property [manager]." Although he addressed the fax to Hamlett, he sent it to the payroll department, in which Hamlett did not work. Hamlett claims that he did not see the fax.

Hamlett testified that because he had not heard from Harris by May 13, 2005, he concluded that Harris had abandoned his job. Accordingly, Hamlett sent Harris a letter, dated May 13, 2005, terminating his employment. Three days later, on May 16, 2005, Harris began his new job at Maryland Management. On June 13, 2005, Hamlett hired Dante Logan, an African American, to replace Harris as Somerset's maintenance technician.

B.

Harris brought suit in the United States District Court for the District of Maryland, alleging that Apartment Services demoted and terminated him because of his race and in retaliation for his complaints about racial discrimination, in violation Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1) and 42 U.S.C. § 1981.

On March 7, 2011, the district court granted summary judgment in favor of Apartment Services. The court determined that Harris failed to put forth sufficient direct or circumstantial evidence that his termination was based on race. Additionally, the court determined that Harris failed to present a prima facie case for discriminatory discharge because he was replaced by another African American individual, and he presented no evidence that could show that Apartment Services's legitimate proffered reason for firing Harris was disingenuous. The district court concluded that no issue of material fact existed with respect to pretext. The district court also rejected Harris's retaliation claim, finding that he failed to show he engaged in protected activity as required to establish a prima facie case of retaliation. However, the district court failed to consider Harris's protest of the racist remark in his phone conversation with Hamlett when determining whether Harris had engaged in protected conduct. Further, it appears that the

9

district court overlooked the issue of Harris's demotion as a distinct aspect of his discrimination claim. Harris timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review de novo the district court's order of summary judgment in favor of Apartment Services, applying the same standard as the district court. See Holland v. Wash. Homes, Inc., 487 F.3d 208, 213 (4th Cir. 2007). We affirm the order only if, viewing the evidence and drawing all reasonable inferences therefrom in favor of the nonmovant, there are no disputed material facts and the moving party is entitled to judgment as a matter of law. Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 300 (4th Cir. 2010) (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)) (internal quotation marks omitted). Instead, "factual disputes must be both material and genuine." Id. "A mere 'scintilla of evidence' is not sufficient to withstand a motion for summary judgment." Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999) (per curiam). "Summary judgment will not lie if

10

the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 242.

III.

Harris contends that the district court erred when it granted summary judgment to Apartment Services on his claims that he was discriminated against because of his race when he was demoted and ultimately terminated. Harris asserts his claims under two federal statutes: Title VII and § 1981. These statutes impose identical requirements to evaluate race discrimination claims. See Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004). Therefore, the district court was correct in analyzing the statutes together.

A.

A plaintiff may establish a claim of race discrimination in one of two manners. First, he may do so "by demonstrating through direct or circumstantial evidence that his race was a motivating factor in the employer's adverse employment action." Holland, 487 F.3d at 213. "The second method of averting summary judgment is to proceed under a 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered

11

permissible reason for taking an adverse employment action is actually a pretext for discrimination." Id. (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004)(en banc)) (internal quotation marks omitted).

Harris seeks to use both avenues of proof. First, Harris asserts that the district court erred because he produced sufficient direct and circumstantial evidence that discrimination led to his demotion and termination to establish a case of race discrimination without applying the McDonnell Douglas pretext framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Second, Harris asserts that even if he failed to produce sufficient evidence to establish a claim of race discrimination, he produced evidence sufficient to satisfy the McDonnell Douglas burden shifting proof scheme. We will address each argument in turn.

B.

Harris first contends that he has put forth sufficient direct and circumstantial evidence of discrimination to survive a motion for summary judgment. But, the only direct or circumstantial evidence Harris has presented that his demotion and termination were motivated by race is his claim that he overheard Hamlett refer to him using a racial epithet. As an initial matter, however, it is highly speculative that Hamlett

12

ever made the remark. Harris never claims any remark was made to him: rather, Harris claims to have overheard Hamlett make the comment through Mike King's cell phone receiver, as Harris was greeting him from the other side of the leasing office doorway. Moreover, the only person who claims to have heard the remark is Harris himself. Two other individuals were also present when the comment was allegedly uttered -- King and a leasing manager named Deborah Baldauf -- and both deny that the remark was ever made.

In any event, even viewing this evidence in the light most favorable to Harris, this evidence is not sufficiently probative to raise a genuine issue of material fact on the issue of whether Hamlett harbored discriminatory animus toward Harris that actually resulted in his demotion and termination. To survive summary judgment, Harris must produce evidence that illustrates a nexus between the discriminatory remark and the adverse employment action. See Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999). In this case, Harris has alleged only one isolated discriminatory statement, and has failed to connect this statement with any of the incidents concerning his demotion and termination. After all, Harris's demotion took place well before the alleged remark was even made. And it was not until nearly two weeks after the remark was supposedly made (by which point Harris had failed to show up

13

to work after the end of his sick leave) that Harris was terminated. Again, we have made clear that "stray or isolated" remarks are insufficient to prove discrimination, see, e.g., Merritt, 601 F.3d at 300, absent some actual relationship to the adverse employment actions under challenge. For the reasons explained herein, the totality of the record evidence fails to raise any triable issue of fact that these actions were taken out of discriminatory animus, and the district court's grant of summary judgment was accordingly warranted.

C.

Next, Harris claims that the district court erred when it concluded that he had failed to prove a prima facie case of discriminatory termination under the McDonnell Douglas framework. Harris also asserts that the district court erred when it failed to consider his claim of discriminatory demotion pursuant to the McDonnell Douglas.

Under McDonnell Douglas, a plaintiff demonstrates a prima facie case of race discrimination by showing that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectation at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside of the

14

protected class. See McDonnell Douglas, 411 U.S. at 802. If Harris makes this showing, the burden shifts to Apartment Services to produce evidence of legitimate, non-discriminatory reasons for terminating or demoting him. See id. If Apartment Services offers legitimate, non-discriminatory reasons for demoting or terminating Harris, Harris must then prove that Apartment Services's proffered reasons for terminating or demoting him are untrue and instead are a pretext for discrimination. See id. at 804. Despite the intricacies of this proof scheme, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Merritt, 601 F.3d at 295 (alteration in original) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000)) (internal quotation marks omitted).

The district court correctly determined that Harris failed to present a prima facie case with respect to his termination. As an initial matter, it is undisputed that Harris, an African American, is a member of a protected class. As the district court noted, it is also uncontested that Apartment Services ultimately hired an African American to fill the Somerset maintenance technician position. Thus, Harris is unable show that he was replaced by a person outside his protected class.

15

Therefore, Harris has failed to establish a prima facie case of discriminatory termination.

D.

With respect to his discriminatory demotion, Harris has demonstrated a prima facie case. To establish a prima facie case for discriminatory demotion, a plaintiff must show that "(1) []he is a member of a protected class; (2) []he was qualified for [his] job and [his] performance was satisfactory; (3) despite [his] qualifications, []he was removed from [his] position and reassigned to a [lower-level] position," and (4) his original position "remained open" or was filled by a similarly qualified applicant outside of the protected class. Love-Lane, 355 F.3d at 787. It is acknowledged that Harris (1) is African American (2) was qualified and performed the role of maintenance supervisor in a satisfactory manner; and (3) was demoted to a maintenance technician. As to the final element, although his particular position at Rosalind disappeared, he was offered a position at Somerset that was later filled by a person outside of the protected class. In sum, Harris can establish the four elements of a prima facie case of race discrimination with respect to his demotion.

Because Harris has established a prima facie case of race discrimination, the burden shifts to Apartment Services to offer

16

legitimate, non-discriminatory reasons for Harris's demotion. Apartment Services presented evidence that Harris was demoted for a non-discriminatory reason, specifically because Hamlett was not informed in a timely manner of Harris's acceptance of the new position. This explanation is sufficient to shift the burden to Harris, who must show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

Harris fails to submit sufficient evidence of pretext. Harris does not dispute that he never informed Hamlett directly that he was willing to work at Somerset, but contends instead that he told Steinhoff of his acceptance. Steinhoff, meanwhile, acknowledges that Harris expressed some interest in the position, but maintains that Harris did not commit until the last week in April. It is admitted, therefore, that Hamlett (1) waited several weeks after Steinhoff offered the position to Harris before offering it to King and (2) was unaware of Harris's willingness to work at Somerset when he offered the position to King. There is no genuine dispute that Hamlett, the decisionmaker with respect to staffing, knew that Harris had been offered the position of maintenance supervisor but believed that Harris declined or had failed to accept it within a reasonable time. Even if this belief arose due to a

17

miscommunication, "mere mistakes of fact are not evidence of unlawful discrimination." Price v. Thompson, 380 F.3d 209, 215 n.1 (4th Cir. 2004). Unfortunately for Harris, he has failed to put forth sufficient evidence showing that Apartment Services's explanation for his demotion was false. Nothing in the record supports an inference that Hamlett's explanation was pretextual or that Hamlett believed that Harris had accepted the position when he offered the position to another employee.

Thus, we agree with the district court's conclusion that Harris failed to prove a case of discriminatory termination, and affirm the district court's grant of summary judgment on the discriminatory termination claim. In light of our de novo review, we also affirm the grant of summary judgment on the discriminatory demotion claim despite the district court's failure to separately analyze the issue of discriminatory demotion.

IV.

Harris further contends that he was terminated in retaliation for complaining about unfair treatment in violation of Title VII and § 1981. Specifically, Harris claims he was fired for complaining about his discriminatory demotion and about Hamlett's racist remark. To state a prima facie case of retaliation, Harris must show that (1) he engaged in a protected

18

activity; (2) Apartment Services acted adversely against him; and (3) the protected activity was causally connected to the adverse action. See Holland, 487 F.3d at 218.

Harris claims that he engaged in protected activity on May 12, 2005, the day before he was terminated, when he faxed a note to Trudy Via complaining of "unfair treatment." Further, Harris claims that he protested the discriminatory demotion and Hamlett's racist remark when speaking with Hamlett on the phone. The district court found that Harris did not engage in protected opposition activity because, in his note seeking to speak with Trudy Via, he complained only of "unfair treatment," not discrimination. See Barber v. CSX Distrib. Servs., 68 F.3d 694, 701–02 (3d Cir. 1995) (concluding that a letter complaining "about unfair treatment in general" is not protected activity). The district court, however, ignored Harris's claim that he protested the alleged discriminatory demotion and Hamlett's racist remark when speaking with Hamlett on the phone. Taking these facts into account, Harris has shown that he engaged in protected activity and that Apartment Services acted adversely against him by terminating his employment.

To prove a causal connection, Harris must be able to prove that Apartment Services fired him because he engaged in protected activity. See Holland, 487 F.3d at 218. Harris can show this by proving that Hamlett had knowledge of the protected

19

activity. The evidence on this point, namely the phone conversation with Hamlett, shows that Hamlett knew of Harris's complaints. Thus, Harris has made out a prima facie case of retaliatory discharge.

Because Harris has made out a prima facie case, the burden shifts to Apartment Services to articulate a legitimate nonretaliatory reason for his termination to rebut the inference of retaliation. See McDonnell Douglas, 411 U.S. at 802. Apartment Services has offered that Harris was fired for job abandonment because Hamlett believed that Harris failed to show for work for several days without a justification for his absence. Consequently, the burden shifts back to Harris to show that the reason proffered is "mere pretext for retaliation by proving both that the reason was false, and that discrimination was the real reason for the challenged conduct." Holland, 487 F.3d at 218 (quoting Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997)) (internal quotation marks omitted).

Harris has failed to make this showing. He is unable to prove that Hamlett fired him as retaliation as opposed to firing him for job abandonment. Harris concedes that he was released to work on May 10, 2005, but that he failed to report to work thereafter and never alerted his immediate supervisor, Mike King, of his absence. Nevertheless, Harris contends that he cannot be fired for job abandonment because Hamlett told him to

20

take the rest of the week off, and because he was merely awaiting Hamlett's call about the Lawyers Hill opportunity. Harris, however, has failed to reconcile an inconsistency within his own statements and conduct. At the same time he testified he was expecting Hamlett's call to begin work at Lawyers Hill on May 16, 2005, he acknowledged that he had already completed paperwork to begin work for Maryland Management on May 16, 2005. Although we do not make credibility determinations at the summary judgment phase, we should also not find a genuine dispute of material fact based solely on Harris's self-serving testimony. See Williams v. Giant Food Inc., 370 F.3d 423, 433 (4th Cir. 2004) ("[A] self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.").

In light of the uncontroverted evidence regarding Harris's absences and his new employment, we agree with the district court that no reasonable jury could find for Harris on the ultimate issue: whether he was terminated in retaliation for protected conduct. See Anderson, 477 U.S. at 242. Accordingly, we affirm the district court's grant of summary judgment in favor of Apartment Services on Harris's retaliation claims.


V.

Harris has presented only a scintilla of evidence from which it may be possible to conclude that race played a factor

21

in his termination and demotion.  Harris has failed to raise a genuine issue of material fact showing that he was terminated or demoted because of his race or that Apartment Services retaliated against him because of his complaint of racial discrimination.  Therefore, we affirm the district court's grant of summary judgment to Apartment Services in all respects.

AFFIRMED